**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEVIN COIT,** | : | |
| **Plaintiff** | : | **No. 1:23-cv-01124** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **L. MALICHAIK, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Currently before the Court are pro se Plaintiff Kevin Coit ("Coit")'s amended complaint, request for entry of default, motion for default judgment, and motion to appoint counsel. For the reasons set forth below, the Court will (1) dismiss certain claims from Coit's amended complaint pursuant to the Court's screening authority under 28 U.S.C. § 1915(e)(2)(B), (2) direct the Clerk of Court to strike Coit's request for entry of default, (3) deem withdrawn Coit's motion for a default judgment, (4) deny without prejudice Coit's motion to appoint counsel, and (5) direct the Clerk of Court to serve the amended complaint (and its remaining claims) on Defendants.

## I. BACKGROUND

### A. Procedural History

Coit commenced this action by filing a complaint, which the Clerk of Court docketed on July 6, 2023. (Doc. No. 1.) Coit named the following individuals as Defendants in his complaint: (1) L. Malichaik ("Malichaik"), an Regional Licensed Psychology Manager, or "RLPM", for the Commonwealth of Pennsylvania Department of Corrections ("DOC"); (2) Bobbi Jo Salamon ("Salamon"), the Superintendent at Pennsylvania State Correctional Institution Rockview ("SCI Rockview"); (3) M. Rowe ("Rowe"), Deputy Superintendent for Centralized Services at SCI Rockview; (4) S. Woodring ("Woodring"), Deputy Superintendent of Facility Management at SCI Rockview; (5) T. Miller ("T. Miller"), a Correctional Classification

Program Manager at SCI Rockview; (6) SCI Rockview Unit Manager Knapp ("Knapp"); (7) SCI Rockview Unit Manager C. Miller ("C. Miller"); (8) Haldeman, a Major at SCI Rockview; (9) SCI Rockview Grievance Coordinator N. Paul ("Paul"); (10) SCI Rockview Assistant Grievance Coordinator Brubaker ("Brubaker"); (11) Davis, a Captain at SCI Rockview; (12) Frank, another Captain at SCI Rockview; (13) SCI Rockview Licensed Psychology Manager D. Durst ("Durst"); (14) Dr. Coxey, a doctor at SCI Rockview; (15) SCI Rockview Registered Nurse Greg ("RN Greg"); (16) SCI Rockview Registered Nurse Dawn ("RN Dawn"); (17) SCI Rockview Psychological Services Specialist Hoover ("Hoover"); (18) SCI Rockview Correctional Officer Hershey ("Hershey"); (19) Dr. V. Preston, another doctor at SCI Rockview; (20) SCI Rockview Staff Assistant Sam Condo ("Condo"); and (21) SCI Rockview Correctional Officer John Doe on 2-10 Shift ("CO Doe"). See (id. at 1–6).

When Coit filed his complaint, he did not remit the filing fee or seek leave to proceed in forma pauperis; as such, an Administrative Order issued requiring him to either pay the fee or file an application for leave to proceed in forma pauperis. (Doc. No. 4.) Approximately two weeks later, Coit filed an application for leave to proceed in forma pauperis ("IFP Application") and his certified prisoner trust fund account statement. (Doc. Nos. 5, 6.)[1] Coit then filed a motion to amend his complaint on July 31, 2023. (Doc. No. 7.)

On August 1, 2023, the Court entered an Order which, inter alia, granted the IFP Application, deemed Coit's complaint filed, granted his motion to amend his complaint, and provided him with a period of thirty days from the date of the Order to file his amended complaint. (Doc. No. 8.) Coit's amended complaint was docketed with the Clerk of Court on

[1] Coit later filed a second application for leave to proceed in forma pauperis and certified prisoner trust fund account statement. (Doc. Nos. 15, 16.) The Court denied this second in forma pauperis application as moot. See (Doc. No. 20 ¶ 1).

September 19, 2023. (Doc. No. 11.) In the amended complaint, Coit no longer named Frank as a Defendant; changed the names of RN Dawn and RN Greg to Dawn Retorick ("Retorick") and Greg Kojadinovich ("Kojadinovich"), respectively; and added SCI Rockview Lt. Vogt ("Vogt"), DOC Regional Deputy Secretary Robert Marsh ("Marsh"), SCI Rockview Psychological Services Specialist ("PSS") Amanda Ackley ("Ackley"), SCI Rockview Lt. Butler ("Butler"), SCI Rockview Lt. Stover ("Stover"), and SCI Rockview Corrections Counselor Minnoia ("Minnoia") as Defendants. See (id. at 1–9). Coit's allegations relate to events that allegedly occurred while he was incarcerated at SCI Rockview from February through August 2023, and he asserts numerous legal claims against Defendants in their individual and official capacities, including: (1) 42 U.S.C. § 1983 claims for violations of his rights under the Eighth Amendment to the United States Constitution based on (a) excessive force, (b) the conditions of his confinement, (c) a failure to protect, (d) deliberate indifference to his serious medical needs, and (e) his vulnerability to suicide; (2) Section 1983 claims for violations of his due process and equal protection rights under the Fourteenth Amendment; (3) Section 1983 claims for violations of the First Amendment based on retaliation and his inability to practice his religion; (4) Section 1983 claims for violations of the Fourth Amendment based on unlawful searches of his prison cell; and (5) violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). See (id. at 10–65). For relief, Coit seeks monetary damages, a "transfer," and the "implementation of policy." See (id. at 65).

After screening Coit's amended complaint, the Court issued a Memorandum and Order on January 25, 2024, which, inter alia, dismissed the amended complaint because it did not comply with Federal Rules of Civil Procedure 8(a) and 8(d)(1) insofar as it is sixty-eight pages long, contains over three hundred and seventy handwritten paragraphs, and includes at least

twelve causes of action against the twenty-six named Defendants. See (Doc. Nos. 19, 20). The Court also granted Coit leave to file a second amended complaint within thirty days. See (Doc. No. 20 at 2).

Instead of filing a second amended complaint, Coit filed a notice of appeal to the Third Circuit Court of Appeals on February 6, 2024. (Doc. No. 22.) Two days later, Coit filed a motion to appoint counsel and a supporting brief. (Doc. Nos. 24, 25.) On June 28, 2024, the Court issued an Order denying Coit's motion to appoint counsel without prejudice to him refiling his motion with the Third Circuit. (Doc. No. 28.)

On September 12, 2024, the Third Circuit issued a nonprecedential decision vacating the January 25, 2024 Order dismissing Coit's amended complaint and remanding the case to this Court for further proceedings. (Doc. No. 31-1.)[2] On April 24, 2025, Coit filed a request for entry of default as well as a motion for a default judgment. (Doc. Nos. 32, 33.) On December 17, 2025, the Court issued an Order deeming Coit's motion for a default judgment withdrawn due to his failure to file a supporting brief in accordance with the Local Rules. See (Doc. No. 36 at 1 (citing M.D. Pa. L.R. 7.5)). On February 17, 2026, Coit then filed another request for entry of default, a second motion for a default judgment, a document titled "Judgment on [D]efendants," and declarations in support of his motion for a default judgment. See (Doc. Nos. 39–42). Then, on April 23, 2026, Coit filed a second motion to appoint counsel along with a supporting brief. (Doc. Nos. 43, 44).

[2] The Third Circuit's mandate was issued on October 7, 2024. (Doc. No. 31.)

**B. Coit's Factual Allegations in His Amended Complaint**

Before reciting Coit's factual allegations, the Court will discuss the way he organizes his amended complaint. As indicated above, Coit names twenty-six individuals as Defendants in this case, and he alleges facts covering an approximately seven-month period in 2023 over the course of approximately three hundred and seventy numbered paragraphs. Many of those individual paragraphs contain allegations against several Defendants and are not isolated to alleged acts by a single Defendant.

Coit attempts to organize his factual allegations against Defendants by cause of action; however, he fails in this endeavor because he repeats the same facts in separate sections of his amended complaint. For instance, Coit alleges that a certain Defendant failed to provide him with medical attention unless he withdrew grievances in the portion of his amended complaint pertaining to his Eighth Amendment excessive force claims, see (Doc. No. 11 ¶¶ 12–14), and then he repeats part of this allegation and actually adds to it in the part of his amended complaint relating to his First Amendment retaliation claims. See (id. ¶¶ 274–75).

Coit also alleges facts pertaining to potential causes of action other than the one in which the factual allegation is located. For example, although some of Coit's factual allegations in the excessive force section of his amended complaint describe incidents potentially involving certain Defendants' use of excessive force, Coit also includes allegations describing events that sound as if Coit seeks to assert claims for First Amendment retaliation or Eighth Amendment deliberate indifference to his serious medical needs. See, e.g., (id. ¶¶ 10–14, 23–24, 27–28).

Overall, Coit's organization of his amended complaint combined with the sheer breadth of his allegations against numerous Defendants has rendered this Court's review of those allegations much more difficult than a typical screening under Sections 1915(e)(2)(B) and

1915A(a). Nevertheless, the Court has organized those allegations by date (instead of by cause of action) to hopefully cover all of Coit's allegations and legal claims against Defendants.[3]

### 1. On or About February 1, 2023[4]

Coit arrived at SCI Rockview on February 1, 2023. See (Doc. No. 11 ¶ 329). On or about the same date, he was placed in the Behavioral Management Unit ("BMU"), a "program designed for problematic prisoners across the [Commonwealth] of Pennsylvania." See (id. ¶¶ 1, 330–31). The BMU "is not a level 5 housing unit and is designed to be the least restrictive envoirment [sic] until a BMU prisoner is reintegrated into a general population setting." See (id. ¶ 332). In addition, a prisoner's custody status, including whether they are in administrative or disciplinary custody, are "set aside" while the prisoner is in the BMU. See (id. ¶ 333). Coit asserts that he was the only Hispanic prisoner in SCI Rockview's BMU. See (id. ¶ 344).

### 2. On or About February 7, 2023

Dr. Coxey, Durst, Knapp, and Ackley visited Coit on or about February 7, 2023. See (id. ¶ 216). These Defendants told Coit that "life at [SCI R]ockview was going to be very difficult because [he] sued [Marsh] at SCI Frackville." See (id. ¶ 217).

---

[3] Although not addressed in this Memorandum, there is a possible issue with the joinder of Coit's claims against Defendants in his amended complaint. See Fed. R. Civ. P. 20(a)(2) (providing that claims against multiple defendants may be joined in the same action only if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action").

[4] Coit regularly identifies the dates of events as occurring "on or about" a particular date. For purposes of this Memorandum, to the extent that the Court omits the use of the phrase "on or about" when referencing an alleged event, such omissions are not intended to limit Coit to said date when attempting to prove his allegations and claims. Instead, the Court is merely attempting to best organize his allegations and claims, especially considering that Coit generally does not identify the time of day for any events alleged in his complaint and some portions of his allegations appear to conflict with each other.

**3. On or About February 8, 2023**

On or about February 8, 2023, Coit spoke to Rowe, Woodring, Haldeman, Ackley, and Knapp about the comments Dr. Coxey, Durst, Knapp, and Ackley made to him the prior day. See (id. ¶ 218). Ackley and Knapp admitted to Rowe, Woodring, and Haldeman that they made those comments. See (id.). Rowe, Woodring, and Haldeman then told Coit, "[W]elcome to Rockview[,] we do things different [sic] here[,] and we look out for each other. So[,] get with the program or we will do what we have to do to break you." See (id.).

Coit alleges that he filed a grievance pertaining to these comments. See (id. ¶ 219). However, Coit claims to have never received a pink copy showing receipt of his grievance. See (id.).

**4. On or About February 16, 2023**

Coit alleges that on or about February 16, 2023, he told Ackley that he was suicidal and wanted to go to the POC. See (id. ¶ 147). Ackley responded by informing Coit that he "needs to either group up or hurry up and kill himself because [Coit was] always saying he is suicidal." See (id.). Ackley then walked away from Coit. See (id.).

Coit also spoke to Dr. Coxey while in the presence of CO Doe and Hershey. See (id. ¶ 148). Coit indicated to Dr. Coxey that he was suicidal and wanted to go to a Psychiatric Observation Cell ("POC") to prevent himself from engaging in self-harm. See (id. ¶ 149). Dr. Coxey, despite knowing Coit's "extensive suicide history," told Coit to "stop fucking playing games and wasting his time, and if [Coit] truly is suicidal to kill himself and let him see [Coit] do it." See (id. ¶ 150). "After several minuets [sic] of [Coit] pleading to [Dr.] Coxey to just place [him] in [the POC] for his own safety," and Dr. Coxey's "continuous encouragements," Coit

"began to swallow batteries, spoon [sic], nail clippers, and toothbrush [sic] in front of [Dr.] Coxey and . . . Hershey." See (id. ¶ 151).

Although Coit swallowed these items in front of Dr. Coxey and Hershey, Dr. Coxey asked Hershey if he "s[aw] anything," and both individuals agreed that they did not see anything. See (id. ¶ 152). They also did not report Coit's acts of self-harm. See (id. ¶ 153). Coit submitted multiple sick calls because of stomach pain he experienced due to swallowing those items; however, no one ever responded to him. See (id. ¶ 154).

"After speaking with [Dr.] Coxey," Coit was lying down on his mattress and watching television when Hershey, "out of nowhere" and without justification, sprayed O/C spray into Coit's cell. See (id. ¶¶ 2–3). At the time, Coit claims that he was complying "with all orders to be handcuffed and restrained" and did not resist. See (id. ¶ 4).[5]

At some point on this date, Coit was placed in a POC. See (id. ¶ 174). While there, C. Miller ordered CO Doe to search Coit's cell. See (id. ¶¶ 175, 197, 202, 358).[6] Coit asserts that C. Miller instructed the staff to violate two of the DOC's policies, DC-ADM 203 and DC-ADM 804, when conducting the search. See (id. ¶ 358).

[5] This is an example of Coit's amended complaint lacking chronological cohesiveness and containing potential inconsistencies. He describes one conversation with Dr. Coxey during which he not only requested to be moved to a POC because he was suicidal, but he had also swallowed several nonfood items. His stomach was also hurting so much that he filed several sick calls for medical assistance. Although all these events allegedly occurred, Coit claims to have laid down to watch television after talking with Dr. Coxey, only to have Hershey spray him with O/C spray. It is nonsensical that Coit would just lie down to watch television given what he also claims occurred on February 16, 2023.

[6] In the latter half of his amended complaint, Coit alleges that Knapp ordered the cell search and the confiscation of his property because Coit filed grievances against him, Rowe, Woodring, Ackley, Haldeman, and Dr. Coxey. See (id. ¶ 231).

CO Doe searched Coit's cell and, even though CO Doe confiscated Coit's art supplies, he did not issue Coit a confiscation slip so Coit could seek the return of his supplies or grieve the loss of his supplies. See (id. ¶¶ 176–77, 358). Coit has an "art permit" allowing him to have art supplies in his cell. See (id. ¶ 196).

Also on this date, Coit was in group when non-Defendant Correctional Officer Crisswell asked him "why he was only here a week and already filing grievances and rating [sic] on staff." See (id. ¶ 220). Coit then requested to leave the group when Ackley told him, "No, you are ok[,] me and Knapp have something for you." See (id. ¶ 221). Ackley then "canceled" the group. See (id.).

Ackley and Knapp accused Coit of refusing to leave the group. See (id. ¶ 222). Knapp then "entered" the group and told Coit, "[I] got you now[. Y]ou should have just come here and relaxed but you wanted to file a grievance instead[.] Now deal with the consequences[.]" See (id. ¶ 223). Knapp left the room. See (id.). Apparently, someone (presumably Ackley or Knapp) then placed Coit on a movement restriction, and Coit asserts that occurred because he previously filed a grievance on Rowe, Woodring, Haldeman, Knapp, Ackley, Durst, and Dr. Coxey. See (id. ¶ 224).

**5. On or About February 17, 2023**

On February 17, 2023, Coit had a medical visit with Dr. Preston during which Coit informed him that he was experiencing stomach pains due to swallowing foreign items the prior day. See (id. ¶¶ 34–35, 225). Dr. Preston told Coit that he did not care and that Coit should not have swallowed those items. See (id. ¶ 36). Dr. Preston also told Coit that if he wanted to

receive treatment, Coit had to agree to withdraw another civil action he filed, Coit v. Marsh,[7] decline to pursue his abuse allegation against Hershey, and stop filing grievances. See (id. ¶¶ 37, 225). When Coit refused to withdraw the case, Dr. Preston told him that he was going to be discharged from the POC and returned to G Block without treatment. See (id. ¶¶ 38–39, 227).

**6. On or About February 17, 2023, to February 21, 2023**

On or about February 17, 2023, Coit was discharged from the POC and placed in "GA 1001 cell, which is a hard cell and a grind up cell," on instructions from Durst, Dr. Coxey, Ackley, and C. Miller. See (id. ¶¶ 40, 117, 139–40, 206, 227). Coit complained to "Miller" and Ackley about his cell conditions because his cell walls had blood, feces, dried up spit, and insects on them. See (id. ¶ 41).[8] Coit also requested cleaning supplies, only to have "Miller" tell him that "since [he] wants to behave like an animal[,] he will be treated like one," and Ackley say to him that "it will be ok[,] just deal with it for now." See (id. ¶¶ 42, 118, 207). Additionally, Dr. Coxey, Durst, Ackley, and "Miller" informed Coit that he could not be moved to a different cell unless he did not pursue abuse allegations against Hershey and Dr. Coxey. See (id. ¶ 228). When Coit did not agree to this request, Defendants left him in his cell. See (id. ¶ 229).

From February 17, 2023, through February 21, 2023, Coit was, inter alia: (1) denied paper and pens so he could not file sick calls or grievances, see (id. ¶ 46); (2) "denied all cleaning supplies, showers, soap, or [sic] hygiene," see (id. ¶¶ 43, 207); and (3) forced to eat his

---

[7] Although Coit does not provide a docket number for this case in his amended complaint, the Court presumes for purposes of this Memorandum that he is referring to Coit v. Marsh, No. 22-cv-01567 (M.D. Pa. filed Oct. 6, 2022).

[8] Due to Coit's reference to Defendant as "Miller," it is unclear whether Coit refers to C. Miller or T. Miller here. See (id.). This is one of several instances in which Coit fails to specify which of the two Miller Defendants was involved in the alleged events in his amended complaint.

meals in those cell conditions "without being able to wash his hands" and having "bugs flying inside [his] food." See (id. ¶ 44). In addition, Coit, who is "a[n] identified Muslum [sic] man," could not "offer his five daily prayers due to [the] living conditions" in his cell. See (id. ¶¶ 207, 209). Moreover, there was constant lighting in his cell, which caused Coit to lose sleep and experience headaches. See (id. ¶¶ 45, 141). Although Coit also complained that he was losing sleep and experiencing headaches to "R.N.S [sic]" when they would distribute medications, he never received treatment for his constant headaches. See (id.).[9]

**7. On or About February 21, 2023**

On or about February 21, 2023, Coit was visited by Durst, Dr. Coxey, C. Miller, and Ackley. See (id. ¶ 47). Coit explained to them that his medications were having "negative side effects" and, as such, he wanted "a medication change." See (id. ¶ 48). Durst, Dr. Coxey, C. Miller, and Ackley told Coit that they would not help him unless he withdrew Coit v. Marsh. See (id. ¶ 49). Furthermore, when Coit complained to these Defendants about his cell conditions, they told him that it "was just a test to see if [he] was going to rat on them." See (id. ¶¶ 120–21). Since Coit did not do so, they told him that he would be moved. See (id. ¶ 121).

**8. On or About March 1, 2023, to Approximately March 14, 2023**

Salamon, Rowe, Woodring, Haldeman, and C. Miller initiated a lockdown in the BMU on March 1, 2023. See (id. ¶ 50). The BMU remained on lockdown for approximately two weeks, i.e., until approximately March 14, 2023, during which there was no mental health programming, including no "mental health groups" or "yards/exercise." See (id. ¶¶ 51, 111, 365). Coit did not receive any mental health programing despite having a "[D] Code" signifying that he is

[9] The Court presumes that Coit's use of "R.N.S [sic]" refers to registered nurses; however, he never identifies the nurses in his complaint. See (id.).

diagnosed as having a severe or serious mental illness and his diagnoses require that he receive mental health treatment in the forms of groups and "psych contacts." See (id. ¶¶ 109–11). His lack of "mental health groups" during this approximately two-week period was due to orders from Salamon, Rowe, Woodring, C. Miller, Knapp, Haldeman, Durst, Ackley, Dr. Coxley, and T. Miller. See (id. ¶ 112).

**9. On or About March 5, 2023**

On or about March 5, 2023, Coit filed three grievances: (1) Grievance No. 1023022 pertaining to alleged excessive force by Hershey and Dr. Coxey because nothing was being done about the "incident," despite Coit reporting it to "Miller" and Stover, see (id. ¶ 230); (2) Grievance No. 1023025 because Coit was never interviewed about his claims against Dr. Coxey even though he told Durst about the incident on "numerous occasions," see (id. ¶ 232); and (3) Grievance No. 1023010 because Coit was not receiving mail, see (id. ¶ 234). Coit alleges that he appealed from presumably rejections/denials of Grievance Nos. 1023025 and 1023010, but he did not receive responses to his appeals. See (id. ¶¶ 233, 235).

**10. On or About March 7, 2023**

On or about March 7, 2023, Coit spoke to Brubaker about the lack of responses to his grievances or pink receipts for his submitted grievances. See (id. ¶ 236). Brubaker told Coit that he "is going to be hurt" if he continued to pursue his grievances and abuse allegations. See (id. ¶ 237). Brubaker also told Coit that he needed to "make [Coit v. Marsh] disappear." See (id.). Following Brubaker's comments, Coit filed a grievance against him; however, Coit did not receive a pink receipt after submitting the grievance. See (id. ¶ 238).

**11. On or About March 9, 2023**

Coit again spoke to Brubaker about not receiving mail or pink receipts for his grievances on or about March 9, 2023. See (id. ¶ 239). Brubaker responded by telling Coit that if he filed another grievance on him, he would punch Coit in the face and "knock out some more teeth." See (id. ¶ 240). After this interaction, Coit filed another grievance against Brubaker "for threats of violence." See (id. ¶ 241). Coit never received a response to this grievance. See (id. ¶ 242).

**12. On or About March 14, 2023**

On or about March 14, 2023, Durst, Ackley, Dr. Coxey, Minnoia, and C. Miller met with Coit. See (id. ¶ 243). During the meeting, they asked Coit to withdraw his grievances against Dr. Coxey and Hershey in exchange for their support of a "phase advancement" for him. See (id.). Coit declined to withdraw his grievances, and these Defendants told him that the "[Program Review Committee] is going to deny [Coit's] phases until [he] withdraw[s] his grievances." See (id. ¶ 244).

**13. On or About March 15, 2023**

On or about March 15, 2023, Rowe, Woodring, and Haldeman "reviewed" Coit and denied his phase advancements because he filed grievances against them. See (id. ¶ 245). Coit then submitted request slips to Rowe, Woodring, and Haldeman inquiring about their denial of "his phases." See (id. ¶ 246). Coit did not receive responses to his request slips. See (id. ¶ 247).

On the same date, Coit informed Brubaker that he was not receiving mail, pink receipts for his submitted grievances, or responses to his grievance appeals. See (id. ¶ 248). Brubaker told Coit, "[S]ince you like to file grievances so much[, a]ll your grievances are going to be filed as frivolous so [I] can put you on [a grievance] restriction." See (id.).

Due to these events on March 15, 2023, Coit filed grievances relating to the denial of his phase advancements and Brubaker's threat to place him on a grievance restriction. See (id. ¶ 249). Coit did not receive responses to the two grievances. See (id. ¶ 250).

Also on this date, Coit sent his tablet to be repaired, and Coit alleges that his tablet was eventually returned to SCI Rockview on March 28, 2023. See (id. ¶¶ 181, 182). Despite the tablet's return to SCI Rockview, Coit has not received his tablet, and he did not receive a confiscation slip for it. See (id. ¶ 182).

**14. On or About March 21, 2023**

On March 21, 2023, Knapp ordered a search of Coit's cell and told Coit that his cell would continue to be searched unless he withdrew his grievances against Rowe and Woodring. See (id. ¶¶ 178–79, 198, 202, 359). CO Doe searched Coit's cell and once again confiscated Coit's art supplies and did not issue Coit a confiscation slip for those items. See (id. ¶¶ 180, 359).

**15. On or About March 22, 2023**

On March 22, 2023, Rowe, Woodring, T. Miller, Haldeman, and C. Miller "reviewed" Coit. See (id. ¶ 258). These Defendants "demanded" that Coit withdraw his grievances or he would not progress through the BMU, and "once that did not work[, he] was threatened wi[th] assault by the defendants." See (id.). Coit submitted a grievance about Defendants' threat, but he did not receive a pink receipt or a response to the grievance. See (id. ¶¶ 261–62). Coit also submitted a request slip to staff inquiring why Rowe was "denying [Coit] his phase advancements." See (id. ¶ 259). He never received a response to this request slip. See (id. ¶ 260).

**16. On or About March 22–23, 2023**

On or about March 22–23, 2023, Coit filed Grievance No. 1025647 because he continued to not receive mail, pink copies for grievances submitted, and grievance appeals from Brubaker and Paul. See (id. ¶ 251). Coit did not receive a pink receipt after submitting this grievance. See (id. ¶ 255). Coit then spoke to Paul, Rowe, Woodring, Knapp, and T. Miller, and they told him that "he needs to withdraw his grievances[,] or he is going to be assaulted for filing grievances." See (id. ¶ 252). Based on this "threat," Coit filed another grievance. See (id. ¶ 253). It appears that this grievance was rejected or denied, and Coit appealed from the rejection or denial. See (id. ¶ 254). However, Coit did not receive a response to his appeal. See (id.).

**17. On or About March 23, 2023**

On or about March 23, 2023, Coit submitted a request to staff to non-Defendant Major Vangorder due to "staffs [sic] [a]cts of retaliation." See (id. ¶ 263). Coit never received a response from Major Vangorder. See (id. ¶ 264).

**18. On or About March 27, 2023**

On or about March 27, 2023, Coit submitted Grievance No. 1025719 because Rowe and Woodring were not answering his request slips. See (id. ¶ 265). Although Coit appealed from a rejection/denial of this grievance, he never received a response to his appeal. See (id. ¶ 266).

**19. On or About March 28–29, 2023**

On or about March 28, 2023, Coit filed Grievance No. 1026813 because Rowe, Woodring, Haldeman, and C. Miller told him that he was being disruptive by filing grievances and not taking his medications. See (id. ¶ 267). The following day, this grievance was rejected because Coit was on a grievance restriction. See (id. ¶ 268). Coit alleges that he could not

appeal from his grievance restriction because he never received notice of the restriction. See (id. ¶ 269).

**20. On or About April 5, 2023**

On or about April 5, 2023, Dr. Coxey and Durst demanded that Coit withdraw his grievances, or he would "end up being hurt real bad." See (id. ¶ 270). Coit asserts that he could not grieve this incident because of his grievance restriction. See (id. ¶ 271).

**21. On or About April 6, 2023**

On or about April 6, 2023, Coit was feeling suicidal "due to constant retaliatory conduct[]" by Rowe, Woodring, C. Miller, Haldeman, Ackley, Durst, [Dr.] Coxey, Brubaker, [] Paul, Knapp, and Salamon, and he asked to speak to a PSS. See (id. ¶¶ 155–56). In response, Hoover and C. Miller visited Coit, and Coit expressed that he "was going through some problems and having suicidal thoughts," but he did not want to engage in self-harm. See (id. ¶ 157). C. Miller told Coit that he, Salamon, Rowe, Woodring, T. Miller, Haldeman, Ackley, and Vogt discussed Coit, and they decided that they would ignore Coit if he stated that he was suicidal. See (id.). C. Miller also told Coit that he will not be sent to the POC, and he told Hoover that Coit was not suicidal. See (id.).

Coit then swallowed batteries, a pen, nail clippers, a toothbrush, and a spoon in front of Hoover and Miller. See (id. ¶ 158). Instead of helping Coit, Hoover and C. Miller left him in his cell, where Coit suffered from stomach pain. See (id.).

**22. On or About April 7, 2023**

On or about April 7, 2023, Coit told C. Miller that he was still suicidal, and Coit "began to swallow some more [b]atteries and spoons." See (id. ¶ 159). C. Miller, despite being well aware of Coit's "suicide and self[-]harm history," suggested to Coit that if he wanted to die, he

could go to the shower, "break open his razor," and slice his wrist. See (id. ¶¶ 159, 161). Coit followed C. Miller's suggestion and sliced his wrist with a razor while he was in the shower. See (id. ¶ 160). He was then "left in the shower bleeding for over an hour." See (id.).

Coit was ultimately transported to a hospital. See (id. ¶¶ 5, 163).[10] While at the hospital, Coit spoke to Davis, who told Coit to withdraw his grievances and abuse allegations against Rowe, Woodring, Haldeman, T. Miller, Salamon, and Hershey. See (id. ¶¶ 6–8, 272). Coit told Davis that he would not withdraw his grievances and abuse allegations, after which Coit was shackled with a "racc [sic] belt" two times because he refused to withdraw his grievances.[11] See (id. ¶ 273). Davis ordered "Lt. John Doe" to twice activate the "[RACC] belt[,] forcing [Coit] to aggree [sic] to recant his grievances and abuse allegations." See (id. ¶ 9). Davis also told Coit to refuse any further medical treatment after he was "stitched up," see (id. ¶¶ 10–11).

The same day, Coit returned to SCI Rockview and spoke to Kojadinovich. See (id. ¶¶ 12, 274). Coit told Kojadinovich that he needed medical attention because he "had been hit with [a stun] belt[,] which is 50,000 volts of electricity," and "C/O's [sic] John [D]oe held [Coit] down while the [operating room] supervisor inserted an unknown object in [Coit's] rectum." See (id.). Instead of providing Coit with medical care, Kojadinovich told him that he is a rat and would not get medical care from him or any other registered nurse at +SCI Rockview unless he withdrew

[10] Coit alleges different reasons for his hospitalization. He first alleges that he went to the hospital because he swallowed multiple items. See (id. ¶ 5). He later alleges that he went to the hospital and got "15 stitches in his right arm," which implies that he went there because he cut his arm. See (id. ¶ 163). Although it is possible that Coit was hospitalized for both reasons, this is another example of the lack of clarity in Coit's amended complaint.

[11] The Court presumes Coit is referring to a remote activated custody and control ("RACC") belt, which is used to restrain and control an inmate's behavior. See Perez v. Martin, No. 24-cv-5695, 2026 WL 1494461, at *1 (E.D. Pa. May 28, 2026) (describing RACC belts and their purpose).

all his grievances. See (id. ¶¶ 13, 274). Kojadinovich then walked away from Coit's door. See (id. ¶ 13).

"After several minutes had passed," Kojadinovich returned to Coit's door. See (id. ¶ 14). Coit told Kojadinovich that he was coughing up blood and experiencing "bad stomache [sic] pains." See (id.). Kojadinovich responded by saying, "Good[,] now die slow rat." See (id.). Coit asserts that he was "denied all [m]edical treatment for refusing to sign off on grievances [he] filed." See (id. ¶ 275).

**23. On or About April 8, 2023**

Coit was placed in the POC on or about April 8, 2023, after he attempted suicide the prior day. See (id. ¶ 52). While in the POC, CO Doe gave Coit a razor and told him that it was from Rowe, who "said do it right this time." See (id. ¶¶ 53, 164, 276).

During the "1400 to 2200 shift," Coit produced the razor and told CO Doe that Rowe told Coit to "end his life." See (id. ¶ 54). CO Doe told Coit to "go ahead[,] it only makes his job easier because he does not have to watch dead people." See (id. ¶ 55). Coit cut his wrist and swallowed the razor CO Doe gave to him. See (id. ¶¶ 56, 165, 276). This caused Coit to cough up blood. See (id. ¶¶ 166, 277).

Retorick visited Coit after he was coughing up blood, but she refused to provide him with medical care unless he withdrew his grievances against Rowe and Woodring. See (id. ¶ 166, 277). Coit asserts that he was again "denied all medical treatment." See (id. ¶ 278).

In addition to the above, Coit alleges that after returning from the POC, he noticed that some of his items, such as his art supplies, were missing from his cell. See (id. ¶¶ 183–84). Coit claims that he could not file a grievance because he did not receive a confiscation slip for the removed items. See (id. ¶ 184). CO Doe told Coit that C. Miller and Vogt had ordered a search

of Coit's cell and that C. Miller, Vogt, and Ackley stated that Coit should "stop filing grievances [because he] is not getting nowhere anyway." See (id. ¶¶ 183–84, 198, 202).[12]

**24. April 9, 2023**

During the "1400-2200 shift" on April 9, 2023, Coit was fully restrained in handcuffs and shackles and standing at his cell door, when CO Doe arrived and posted in front of the door. See (id. ¶¶ 15–16). CO Doe then threatened Coit to withdraw his grievances on Rowe, Woodring, T. Miller, Salamon, Hershey, and Haldeman. See (id. ¶¶ 17, 279). Coit refused to withdraw his grievances, resulting in CO Doe informing Coit that Rowe, Woodring, Haldeman, and Salamon gave him "full range on your bitch ass," so they were now going to have "some fun." See (id. ¶¶ 18–19).

"C/O John Doe" began to open Coit's door "wicket" even though it was not Coit's "feeding time" or time to exercise. See (id. ¶¶ 20, 279). Due to Coit's "confusion," he went to the back of his cell and faced the back wall, spread his legs as far as possible, and raised his hands above his head so he did not pose "any threat to anybody." See (id. ¶ 21). Then, without warning or justification, CO Doe sprayed a "whole can of O[]C" spray on Coit, despite a requirement that OC spray could not be used on him unless medically cleared or an emergency because he is asthmatic. See (id. ¶¶ 22–23, 280).

Coit was left in his cell with the OC spray on him for ten to fifteen minutes. See (id. ¶ 24). Coit requested a rescue inhaler, and Retorick told him that "he is a rat and can die for all she cares." See (id.).

---

[12] In a subsequent part of his amended complaint, Coit alleges that "Miller" ordered a search of his cell on or about April 7, 2023, and Coit did not receive a confiscation slip for any items "stolen" from his cell. See (id. ¶ 360). For purposes of this Memorandum, the Court presumes that Coit is referring to the same cell search even though he references different dates for the search in the amended complaint.

**25. On or About April 9, 2023, to April 13, 2023**

At an unknown time on April 9, 2023, Coit was returned into a POC cell where the cell and the bed frame were covered in OC spray. See (id. ¶ 57).[13] From April 9, 2023, through April 13, 2023, Coit "was forced" to sleep on a metal frame covered in OC spray and without a mattress or blanket. See (id. ¶¶ 58–59).

**26. On or About April 10, 2023**

On or about April 10, 2023, Coit saw Dr. Coxey and informed him that his cell was covered in OC spray, and he was sleeping on a metal bed frame also covered in OC spray. See (id. ¶¶ 60, 281). Coit told Dr. Coxey that he was "freezing," and he asked for a "smock blanket." See (id. ¶ 60). In response, Dr. Coxey stated that he would give Coit the "basic items" if Coit withdrew all his grievances. See (id. ¶ 61). Dr. Coxey also told Coit that he needed to withdraw his grievances or he "will be hurt again." See (id. ¶ 282). Dr. Coxey then walked away from Coit's cell. See (id.).

**27. On or About April 12, 2023**

Coit visited with Dr. Preston on or about April 12, 2023. See (id. ¶ 283). Coit informed Dr. Preston that he was coughing up blood, had a sore throat and stomach pains, and was experiencing bad headaches. See (id. ¶ 284). Dr. Preston responded by telling Coit that he had to withdraw grievances "on his coworkers" if he wanted medical treatment. See (id. ¶ 285). Coit was returned to "g-block with no medical care provided." See (id. ¶ 286).

[13] It is unclear from Coit's allegations whether this is the same cell where CO Doe allegedly sprayed him with OC spray.

**28. On or About April 13, 2023**

Coit spoke to Paul on or about April 13, 2023. See (id. ¶ 287). Paul demanded that Coit withdraw his grievances or "she will have her friends assault [him]." See (id. ¶ 288).

**29. On or About April 17, 2023**

On or about April 17, 2023, Coit spoke to Butler about "[a]ll retaliatory actions by . . . [R]owe, Woodring, C. Miller, . . . Ackley, Minnoia, [D]urst, and [Dr.] Coxey," such as "the continuous cell searches and denials of visits." See (id. ¶ 289). Butler told Coit that if Coit brought up this issue with him again, he would "receive a misconduct for assaulting [him]." See (id.).

**30. On or About April 19, 2023**

Rowe, Woodring, Haldeman, and C. Miller visited Coit on or about April 19, 2023. See (id. ¶ 290). During this visit, Coit was "told to just withdraw his grievance and [he] does not have to get hurt." See (id.). Defendants then walked away from Coit's door, calling him a "rat child molester." See (id.).

**31. On or About April 20, 2023**

Coit spoke to Stover and Butler on April 20, 2023. See (id. ¶¶ 113, 291). Stover and Butler demanded that Coit write a statement indicating that he "was lying" about Rowe and Hershey or he would get "hurt on his way back to his cell today." See (id. at ¶ 292). Stover and Butler also told Coit that because he had created so much work for them, he would remain in his cell and could not go to mental health groups, yards, or any programs. See (id. ¶ 114). They also told Coit that if "he so much as argues," he would end up in the emergency room. See (id.). Due to these threats of violence and having been "assaulted three times by [correctional officers, Coit] believed [Stover and Butler] and aggreed [sic] to comply with their directions." See (id. ¶ 293).

**32. On or About April 21, 2023**

"After days of requesting grievances," Coit received and filed two grievances on or about April 21, 2023, despite being on a grievance restriction. See (id. ¶ 294). He could not, however, "file grievances on incidents from April 8, 10, 12, 13, 17, 19, and 20[,] due to [the] grievance restriction [he] never got." See (id. ¶ 295). Apparently, Coit's two grievances were rejected/denied, and he appealed from the rejections/denials. See (id. ¶ 296). He never received a response to his appeals. See (id.).

Coit also spoke to Paul about his grievance issues. See (id. ¶ 297). Paul indicated that Coit "should not be worrying about grievances or grievances [sic] response [sic] but rather be worried about his personal safety." See (id.).

**33. On or About April 24, 2023**

On or about April 24, 2023, Coit submitted a request to staff to Ackley because Ackley "was continuously lying on [Coit's] documents" by stating that Coit was not progressing in his treatment. See (id. ¶ 298). Coit asserts that Ackley made these statements "to retaliate for filed grievances." See (id.).

**34. On or About April 27, 2023**

On or about April 27, 2023, Coit submitted request slips to Rowe, T. Miller, Woodring, Durst, and Dr. Coxey. See (id. ¶ 299). Coit asked them to "please stop having [correctional officers] come to [his] door threatening to kill [him] for filing grievances." See (id.).

**35. April 20, 2023, to May 22, 2023**

"During the weeks of April 20, 2023[,] and May 5, 2023," two other BMU inmates, Manson and Barber, were instructed to get Coit to withdraw his grievances against Rowe, Woodring, T. Miller, Haldeman, and C. Miller, "anyway [sic] that they could." See (id. ¶¶ 78,

339, 340). Manson and Barber were told that Coit was "a rat" and was "worsening the conditions of the [BMU]." See (id.).

After a week of threats from Manson and Barber, Coit submitted a request slip to C. Miller on May 6, 2023, in which he requested to be separated from the two inmates "due to their violent natures and reasoning [sic] for being housed" in the BMU. See (id. ¶ 79). Coit did not receive a response to this request slip. See (id. ¶ 80).

On or about May 15, 2023, Coit submitted a second request to C. Miller, along with a request to Rowe, Woodring, and Haldeman, in which he sought to be separated from Manson and Barber "due to threats of violence and being subjected to numerous forms of sexual harassment." See (id. ¶ 81). After Coit did not receive any responses for several days, he began to verbalize his safety concerns to Vogt, Butler, Stover, and Ackley. See (id. ¶ 82). However, none of these Defendants took steps to protect Coit from Manson and Barber. See (id.).

On or about May 16, 2023, Coit spoke to Rowe, C. Miller, Ackley, Haldeman, Vogt, and Woodring about his safety concerns, and he reported the inmates' threats of violence against him as well as their sexual harassment. See (id. ¶ 83). These Defendants, while on the "range in front of all the [BMU] prisoners," told Coit that he "should not be giving up so much information [because] they can not [sic] process all his paperwork at one time." See (id. ¶ 84). They also called Coit "a valuable rat." See (id.).

Coit submitted multiple request slips on or about May 19, 2023, to C. Miller, Vogt, Ackley, Rowe, Woodring, and Haldeman in which he again asked to be separated from Manson and Barber due to their sexual advances and ongoing threats of violence. See (id. ¶ 85). He never received responses to these requests, see (id.); however, he did speak to C. Miller, Vogt,

and Ackley and told them that he was afraid for his safety because of the inmates' "very extensive assault history." See (id. ¶ 86).

Despite providing these Defendants with information about his safety, Coit was not separated from Manson and Barber. See (id.). In addition, C. Miller gave Manson copies of "several of [Coit's] request slips asking to be separated from [him] and Barber." See (id. ¶ 87). C. Miller also gave Manson "Plaintiff [sic] motion to dismiss for Coit v. Wynder,"[14] and he heard Manson state that he was "going to throw feces and urin [sic] on [Coit]." See (id. ¶¶ 87–88).

On or about May 20, 2023, Coit was "pulled for group to play video [sic] game." See (id. ¶ 89). CO Doe then brought Manson into the group room to participate. See (id. ¶ 90). Coit told CO Doe that Manson could not be next to him due to his physical threats to assault him and that he spoke to C. Miller about Manson threatening to throw feces and urine at him. See (id. ¶¶ 91–92). CO Doe responded by stating "why do you think he is going next to you." See (id. ¶ 92).

Coit told CO Doe that he wanted to leave the room, but he was told that since he was already there, he needed to "deal with it." See (id. ¶ 93). CO Doe then told Manson to "go ahead and take care of this," "C. Miller, Rowe, Woodring, Ackley, Durst, and . . . Vogt to us to take good care of you," and if he "d[id] it[, he] would get no misconduct or nothing." See (id. ¶ 94). CO Doe then walked away. See (id.).

Manson told CO Doe to turn off the lights and shut the door to the room. See (id. ¶ 95). Despite prison policy always requiring supervision of prisoners, Coit and Manson were left in the room together. See (id. ¶¶ 95–96). During a two-hour period, Manson assaulted Coit with

[14] The Court presumes that Coit is referring to a motion to dismiss filed by the defendants in No. 1:22-cv-01277 (M.D. Pa.), a case which is also assigned to the undersigned.

urine and feces. See (id. ¶ 97). Although Coit banged and kicked on the "cage" to get a correctional officer's attention, no one came to help him. See (id. ¶¶ 98–99).

Apparently, someone appeared in Coit's location and, even though Coit was covered in feces, someone told him that "since he likes to be a spic Muslum [sic][,] he was covered in the right colors." See (id. ¶ 337). Coit claims that he was denied a shower and medical attention "[d]ue to [him] being a Spanish Muslum [sic]." See (id. ¶¶ 100, 338).

Coit was also written up for assaulting Manson, but Manson was not written up for assaulting Coit. See (id. ¶¶ 101, 336). In addition, Manson had the opportunity to shower and receive medical attention. See (id. ¶ 339).

On May 22, 2023, Coit was in the shower when CO Doe escorted Barber to the vestibule. See (id. ¶ 102). CO Doe asked Barber if he "remember[ed] the deal," and Barber replied that he did. See (id. ¶ 103). Barber stood on his toes next to where Coit was showering, looked at Coit while he was showering, and "began a slew of sexual comments [about Coit's] penis and butt." See (id. ¶¶ 104, 105, 340). CO Doe then told Barber, "good[,] we got what we needed[. W]e will let PCC and [indiscernible] know you did your job[. W]e will write Coit up for assaulting you." See (id. ¶ 106). CO Doe also laughed and then placed Barber in the shower. See (id.).

Coit was issued a misconduct for the events in the shower, but Barber was not issued a misconduct despite the DOC having a zero-tolerance policy regarding sexual assault and harassment. See (id. ¶¶ 107–08, 341–42). Coit also alleges that Rowe, Woodring, C. Miller, and Vogt "continued and encouraged [Barber] to sexually harass [him,] knowing [he] is a Muslum [sic] and [that I]slam forbids homosexuality." See (id. ¶ 341). "Defendants" further told Coit "not to knock it until [he] tried it and most Muslums [sic] are faggots anyway." (Id.)

**36. On or About April 20, 2023, to May 30, 2023**

From April 20, 2023, until May 30, 2023, Coit was denied all mental health programming, mental health groups, and yards "under the guise that [he] was refusing mental health treatment." See (id. ¶ 115). Coit denies that he refused treatment and claims his records show that "when offered [he wa]s a full participant in mental health treatment." See (id. ¶ 116).

**37. On or About May 4, 2023**

On or about May 4, 2023, Coit talked with Salamon and C. Miller. See (id. ¶ 301). Coit informed them that Hershey was constantly threatening to kill him "for filing grievance [sic] on him." See (id.). Salamon and C. Miller responded by stating, "well[,] that is simple[,] stop filing grievances and you will stay alive or[,] if not[,] keep filing grievances and end up dead." See (id. ¶ 302).

**38. On or About May 6, 2023**

On May 6, 2023, Coit requested to inventory his personal items contained in his property storage and noticed that his new Nike shoes were missing. See (id. ¶¶ 185, 200). Coit then submitted a request to staff to "Miller" informing him about the missing shoes. See (id. ¶ 186). Coit also spoke to CO Doe and asked him, "what is going on" because his property was "constantly coming up missing." See (id. ¶ 187). CO Doe told Coit that "Miller" and Vogt "constantly are having random [correctional officers] going through inmates [sic] property in search of contraband and things are often coming up missing." See (id.).[15] Coit then asked CO Doe for a confiscation slip but was refused. See (id.). Without a confiscation slip, Coit could not file a grievance pertaining to his missing shoes. See (id. ¶¶ 188, 361).

[15] Coit appears to aver that C. Miller and Vogt ordered the search of his personal storage, see (id. ¶¶ 202, 361), and that he did not receive notice of this search. See (id. ¶ 361).

**39. On or About May 11, 2023**

Salamon and C. Miller spoke to Coit on or about May 11, 2023, due to Coit filing a grievance about the "May 4, 2023 incident." See (id. ¶ 303). These Defendants "threaten[ed] to kill [Coit] for being a rat and filing grievance [sic] on them." See (id.).

**40. On or About May 17, 2023**

C. Miller and Salamon stopped by Coit's cell while conducting rounds on May 17, 2023. See (id. ¶ 307). They told Coit that "in case [he] did not know[,] this prison has had 5–6 suicides in the last two months[,] and if [he] did not stop filing grievances[,] he would be mourned for committing suicide." See (id.). C. Miller and Salamon then walked away from the cell. See (id.).

**41. On or About May 23, 2023**

Coit had a meeting with Malichaik, Durst, Dr. Coxey, Ackley, C. Miller, Minnoia, and Vogt, on or about May 23, 2023. See (id. ¶ 304). These Defendants demanded that Coit withdraw his grievances and Coit v. Marsh. See (id.). They told Coit that if he refused, he "will be failed out of the BMU and placed into a rhu/dtu [sic]." See (id.).[16] They also told him that because he "is a filty [sic] spic Muslum [sic] who likes to file grievances and lawsuits[,] he is being placed on phase 5 and recommended for BMU failure." See (id. ¶ 343). Nevertheless, Coit refused Defendants' demand, causing them to "dismiss[ Coit,] stating[,] well[,] go sit in the hole we do not care." See (id. ¶ 305).

---

[16] Coit alleges that Marsh and Malichaik recommended his placement in the BMU despite his "802 [a]ppeals stating [Coit] did not need BMU placement." See (id. ¶ 306); see also (id. ¶ 319 (alleging that Marsh and Malichaik placed him in the BMU despite Coit stating he did not belong there and his appeals in opposition to his BMU placement)).

**42. May 24, 2023, to May 30, 2023**

On May 24, 2023, Coit was placed in a POC cell. See (id. ¶¶ 62, 122). He told Dr. Coxey that his cell was covered in feces, the correctional officers turned off his water for no reason, and he did not have a mattress. See (id. ¶ 63). On May 24, 2023, CO Doe denied Coit his meal, and Coit told Dr. Coxey about it. See (id. ¶¶ 63, 133).

Coit also asked CO Doe if he could be placed into a different cell but was told that he could not be moved because Salamon, Rowe, Woodring, Haldeman, Durst, and Dr. Coxey ordered that he be placed in that cell. See (id. ¶ 123).[17] CO Doe also refused to give Coit cleaning supplies or have a block worker clean Coit's cell because "defendants" told CO Doe that if he did, he would be removed from his post. See (id. ¶ 124). CO Doe further told Coit that he had a message from Rowe, Woodring, and Salamon stating that Coit "is on a hunger strike until [Coit] withdraw[s] his abuse allegation and grievances." See (id.). Until Coit agreed to such a withdrawal, those Defendants "will do whatever they want to [him]." See (id.).

From May 24, 2023, through May 30, 2023, Coit remained in this cell, where he did not have water, toilet paper, or a mattress; he was denied food and showers; and there were feces on the walls, the door, the toilet, and the bedframe. See (id. ¶¶ 64, 125–26, 134, 309). Although Coit spoke to Dr. Coxey and Durst about his cell conditions on multiple occasions, they denied him cleaning supplies and "the chance to have block workers clean the cell." See (id.). Additionally, Coit spoke to Dr. Preston on or about May 26, 2023, about being denied meals and water. See (id. ¶ 135). Dr. Preston told Coit that he was denied meals because he is a rat, and if

[17] Coit alleges that on or about May 24, 2023, C/O John Doe "began a slew of retaliatory actions all naming [Rowe, Haldeman, and Salamon] for their actions of burning [Coit] for his trays and shuting [sic] [off]" Coit's water. See (id. ¶ 308).

he wanted to eat and drink, he needed to withdraw his abuse allegations and grievances on Dr. Preston's "coworkers." See (id.).

Dr. Preston also told Coit on or about May 29, 2023, that he needed to withdraw his grievances on Rowe, Woodring, Haldeman, and Salamon if he wanted medical treatment. See (id. ¶ 310). Coit claims that Dr. Preston denied him all medical care on this date. See (id. ¶ 311).

### 43. On or About May 30, 2023, to June 22, 2023

On May 30, 2023, Coit was returned from the POC and placed in a hard cell, "GA 1001," "on level 5 in the BMU," which was covered in feces, blood, spit, and insects, and did not have a "desk, table, cubby, or chair." See (id. ¶¶ 65, 67, 127–28, 136–37, 142, 312–13). It also had constant lighting, which caused him to suffer headaches and hallucinations for which he submitted numerous sick calls. See (id. ¶¶ 143–45, 312). Coit alleges that he received treatment from "SCI Rockview PA" for his headaches. See (id. ¶ 146).

Coit "was told" that Rowe, Woodring, Haldeman, T. Miller, C. Miller, Vogt, Durst, Dr. Coxey, and Ackley "said [that] until [Coit] learns to stop filing grievances and abuse allegations [he would] remain in GA 1001." See (id. ¶¶ 66, 314). Coit spoke to C. Miller, Vogt, and Ackley about his cell conditions and placement on "phase 5," asked for cleaning supplies, and told them that he is "pro se in several civil cases, [and he] likes to do art[ and] write letters to family and lawyers." See (id. ¶¶ 67, 129–31, 138, 210, 313). Coit also wanted cleaning supplies so he could offer his five "mandatory prayers in accordance to [sic] islamic [sic] beliefs." See (id. ¶ 211). Coit explained that his cell did "not need to be perfect," but it needed to be "at least clean" so he could offer his prayers. See (id. ¶ 212).

C. Miller, Vogt, and Ackley told Coit to get "used to it for being a rat," "that is what he gets for filing lawsuits and grievances," and informed him that he would not get cleaning

supplies until he withdrew his grievances and abuse allegations. See (id. ¶¶ 67, 129–31, 138). They also called him a "terrorist nigger who does not belong in america [sic] and if [he] wants to pray[, he should] get on his knees like all Americans do." See (id. ¶ 213). They further informed Coit that if he "wants a clean cell[, he should] lick the cell clean and then [he] can pray to whoever he wants to." See (id.).

Despite his unsanitary cell conditions, Coit was denied "all cleaning supplies," and C. Miller, Vogt, and Ackley instructed the correctional officers to not allow block workers to clean Coit's cell. See (id. ¶¶ 68, 214). Coit also was unable to offer his "mandatory prayers" from May 30, 2023, until around June 22, 2023, and he was denied the opportunity to "see the muslum [sic] chaplin [sic] or practice the religion of islam [sic]." See (id. ¶ 214).

Coit also spoke to Condo, the staff assistant for Marsh, about his cell conditions on or about May 31, 2023. See (id. ¶¶ 69–70, 77, 316–17). Condo stated, "[O]h well[,] you should not be a rat[.] Act like an animal[,] get treated like one." See (id. ¶¶ 71, 316). Condo also told Coit that he could help him if Coit withdrew all his grievances and Coit v. Marsh; if not, Condo "do[es] not know anything and can't help [him] unless [Coit] write[s Condo] a letter." See (id. ¶¶ 71, 316). Moreover, Vogt and C. Miller arrived, telling Condo that "this is Malichaik [sic] call[,] . . . along with Salamon[,] . . . Rowe, and Woodring." See (id. ¶ 317). Condo then walked away from Coit's cell along with Vogt and C. Miller. See (id. ¶¶ 71, 317). Coit then remained in cell GA 1001 under the above conditions from May 30, 2023, until June 22, 2023. See (id. ¶¶ 76, 132, 315).

On June 2, 2023, Coit spoke to Marsh and Malichaik about Salamon, Rowe, Woodring, T. Miller, C. Miller, Ackley, Durst, Dr. Coxey, Davis, Butler, Stover, and Hershey's "retaliatory actions by placing [him] in [a] hard cell, denying [him] groups for his mental health issues,

[directing the correctional officers to] apply excessive force . . .[,] keeping [him] in a hard cell covered with feces, blood, spit, and insects," and keeping the lights on in his cell "24/7," which caused him headaches and the loss of sleep. See (id. ¶¶ 72, 77, 318). Marsh and Malichaik told Coit that those conditions "should be the least of your worries[,] we are failing you out and placing you in a Rhu [sic] or dtu [sic] for causing so much trouble and filing [Coit v. Marsh.]" See (id. ¶ 318). Marsh also informed Coit that if he withdrew Coit v. Marsh and his grievances, Marsh would "instruct the defendants at [SCI Rockview] to leave [Coit] alone to do his time." See (id. ¶ 72). After Coit refused, Marsh and Malichaik told Coit that there was nothing they could do, and they walked away from his cell. See (id.).

From June 4, 2023, until June 6, 2023, Coit submitted three sick calls. See (id. ¶¶ 73–75). He submitted his first sick call on June 4, 2023, indicating that insects bit him causing him to "develop[] bumps on [the] back of [his] neck." See (id. ¶ 73). The next day, June 5, 2023, Coit submitted a sick call because the constant lighting caused him headaches. See (id. ¶ 74). Finally, on June 6, 2023, Coit submitted a sick call claiming that it was hot in his cell due to the vents not working, and the heat worsened his asthma. See (id. ¶ 75). Coit also stated that he was denied a rescue inhaler per Dr. Preston's orders from May 5, 2023. See (id.).

**44. On or About May 24, 2023, and May 30, 2023**

C. Miller and Vogt ordered a search of Coit's cell after he was placed in the POC on May 24, 2023. See (id. ¶¶ 189–90, 201, 362). Once Coit returned to his cell on May 30, 2023, some of his property was returned to him. See (id. ¶ 191). However, his art supplies, "150–200 legal papers," a "[Section] 1983 complaint [he] intended to file on SCI Phoenix in regards to due process claims," missing pictures of deceased family members, and obituaries, were missing. See (id. ¶ 192).

Coit did not receive a confiscation slip for the missing property, which prevented him from grieving the issue. See (id. ¶¶ 193, 362). He did, however, submit request slips to "Miller" and Vogt asking that they investigate his missing property. See (id. ¶ 194). Coit did not receive responses to his request slips. See (id. ¶ 195).

**45. On or About July 6, 2023**

On or about July 6, 2023, Vogt, "Miller," Ackley, Dr. Coxey, Durst, and Minnoia reviewed Coit. See (id. ¶ 320). They told Coit that "he is lying and deserves to die for being a dirty lying Muslum [sic] and if [he] does not withdraw his grievances on them[,] he is going to get hurt really bad." See (id.). In addition, even though Coit was not issued a misconduct in over two months and was fully participating in his treatment, Ackley told Coit that "it did not matter what [he] said because she is placing in [his] records [that he] is being problematic." See (id. ¶ 321).

**46. On or About July 7, 2023**

Coit was "pulled from his cell" to review his medical file as part of Coit v. Marsh on or about July 7, 2023. See (id. ¶ 25). Durst was initially in the room with Coit for the review, and Vogt and C. Miller later entered the room and questioned Coit about his grievances pertaining to Rowe, Woodring, Haldeman, Salamon, and C. Miller. See (id. ¶¶ 26–27). Vogt and C. Miller were "very hostile and aggressive" questioning Coit and asked him "why [was] he causing so much paperwork." See (id. ¶ 28). Coit then asked to leave "out of fear for his safety." See (id. ¶ 29).

"[O]ut of nowhere," Vogt struck Coit and caused his head to "bounce of[f the] wall." See (id. ¶ 30). C. Miller then struck Coit. See (id. ¶ 31). Although Durst was in the room as well, he did not intervene or report the assaults against Coit. See (id. ¶ 32). Rather, Durst "encouraged

[Coit] to withdraw grievances, [a]buse allegations, and complaint" against him, Dr. Coxey, Kojadinovich, and Retorick. See (id. ¶ 33).

**47. On or About July 9, 2023**

On or about July 9, 2023, Coit expressed that he was suicidal to CO Doe. See (id. ¶ 167). CO Doe responded by telling Coit that Rowe, Woodring, T. Miller, Haldeman, C. Miller, Ackley, Dr. Coxey, Durst, Salamon, and Vogt discussed Coit during the "BMU problematic meeting." See (id. ¶ 167). They relayed to CO Doe that Coit "is behavioral" and should be ignored if he claims to be suicidal. See (id.). Due to these Defendants' "instructions," Coit "was left [in his] cell cutting himself for [h]ours and left bleeding." See (id. ¶ 168).

**48. On or About July 12, 2023**

Ackley, Durst, Dr. Coxey, "Miller," Vogt, and Minnoia visited Coit on or about July 12, 2023. See (id. ¶ 322). During this visit, they demanded that Coit recant his abuse allegations on Vogt and "Miller," and they told Coit that "if he so as much breathes the wrong way[,] he will get punched in the face again" and that he should "just withdraw [sic] because [he] is a low[-]life Muslum and will not be believed by [n]obody because their paperwork will be believed over [him,] especially with them saying that [he] is being problematic." See (id.).

**49. On or About July 19, 2023**

On or about July 19, 2023, Minnoia informed Coit that after the BMU meeting held by Rowe, Woodring, T. Miller, Haldeman, C. Miller, Vogt, Durst, Ackley, and Minnoia, Coit would remain at phase four and "is not going to get [n]othing [sic] because [he] is filing lawsuits on them and . . . constantly filing grievances on them." See (id. ¶ 323). Minnoia also stated that "they" have the "blessings" of Salamon, Marsh, Malichaik, and Condo, to "torment [him] until those lawsuits disappear and [he] learns to stop filing grievances." See (id.).

**50. On or About August 2, 2023**

On August 2, 2023, Coit "requested to go to the POC" after feeling "depressed and suicidal" and swallowing two pens. See (id. ¶ 169). Coit then spoke to Ackley and began swallowing a third pen. See (id. ¶ 170). Ackley told Coit that "she did not see anything" and asked him why he "continue[s] to lie on staff and bother[ them] by [f]iling grievances and abuse allegations" even though he knows that she will state in his records that "he is the problem." See (id.). Ackley also told Coit that she would not admit him to the POC because Vogt knew Coit "was playing games when [he] said he was suicidal at 11:30 [a.m.]" See (id.).

On the same date, non-Defendant Correctional Officer Vaow ("CO Vaow") came to Coit's cell door. See (id. ¶ 171). Coit told CO Vaow that he was suicidal, and CO Vaow responded by telling Coit that Vogt "said if he gets mandated[, his] death would surely look like suicide." See (id.). CO Vaow then walked away from Coit's cell. See (id.).

Coit alleges that he was denied all medical and mental health care on August 2, 2023. See (id. ¶ 172). He asserts that Vogt, Ackley, Rowe, C. Miller, Woodring, Haldeman, Durst, and Dr. Coxey instructed the correctional officers to deny him mental health care despite knowing his suicide history. See (id.).

**51. On or About August 16, 2023**

Coit participated in a one-on-one meeting with Ackley on or about August 16, 2023. See (id. ¶ 324). During this meeting, Ackley told Coit that "he is a worthless nigger Muslum [sic] who keep [sic] causing problems by filing grievances and lawsuits[, so he] needs to just stop because her word will be believed over a dirty Muslums [sic]." See (id.) Ackley then told Coit that she had to file his paperwork due to his "threatening behaviors." See (id.).

On the same date, Vogt entered the group room and told the group, "[H]ey[,] this dirty Muslum [sic] nigger keep [sic] filing grievances," was "being a rat," and was "messing things up for you all." See (id. ¶ 325). Vogt also said, "[Y]ou need to take care of him and [I] will take care of you." See (id.).

## II. LEGAL STANDARDS

### A. Screening of Operative Complaints Under 28 U.S.C. §§ 1915A and 1915(e)(2)

Under 28 U.S.C. § 1915A, this Court must "review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." See 28 U.S.C. § 1915A(a). If a complaint is frivolous or fails to state a claim upon which relief may be granted, the Court must dismiss the complaint. See id. § 1915A(b)(1). The Court has a similar screening obligation with respect to actions filed by prisoners proceeding in forma pauperis. See id. § 1915(e)(2)(B)(ii) ("[T]he [C]ourt shall dismiss the case at any time if the [C]ourt determines that . . . the action or appeal . . . is frivolous . . . [or] fails to state a claim on which relief may be granted . . . .").

A complaint is frivolous under Sections 1915A(b)(1) and 1915(e)(2)(B)(i) if it "lacks an arguable basis either in law or fact." See Neitzke, 490 U.S. at 325. In addition, when reviewing whether a plaintiff has failed to state a claim upon which relief may be granted under Sections 1915A(b) or 1915(e)(2), the Court applies the standard governing motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See, e.g., Smithson v. Koons, No. 15-cv-01757, 2017 WL 3016165, at *3 (M.D. Pa. June 26, 2017) ("The legal standard for dismissing a complaint for failure to state a claim under § 1915A(b)(1) [and] § 1915(e)(2)(B)(ii) . . . is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure."), report and recommendation adopted, 2017 WL 3008559 (M.D. Pa. July 14,

2017); Mitchell v. Dodrill, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010) (explaining that when reviewing a complaint for possible dismissal pursuant to § 1915A, "a court employs the motion to dismiss standard set forth under Federal Rule of Civil Procedure 12(b)(6)"). To avoid dismissal under Rule 12(b)(6), a plaintiff must set out "sufficient factual matter" in the complaint to show that their claims are facially plausible. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)). When evaluating the plausibility of a complaint, the Court accepts as true all factual allegations and all reasonable inferences that can be drawn from those allegations, viewed in the light most favorable to the plaintiff. See id.; In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). However, the Court should not accept legal conclusions as true, and "a formulaic recitation of the elements of a cause of action" will not survive a complaint's screening under Sections 1915A and 1915(e)(2). See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).

In addition, in the specific context of pro se prisoner litigation, the Court must be mindful that a document filed by a pro se litigant is "to be liberally construed." See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Higgs v. Att'y Gen., 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)). Therefore, a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting Estelle, 429 U.S. at 106). This means the court must "remain

flexible, especially 'when dealing with imprisoned pro se litigants . . . .'" See Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (quoting Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244–45 (3d Cir. 2013))).

Additionally, when construing a pro se complaint, the court will "apply the relevant legal principle even when the complaint has failed to name it." See Mala, 704 F.3d at 244. However, pro se litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'" See Vogt, 8 F.4th at 185 (quoting Mala, 704 F.3d at 245).

### B. Section 1983

Section 1983 is the statutory vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id. "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002)). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

**C. RLUIPA**

"Congress passed RLUIPA to grant heightened protection to prisoners from burdens imposed by the government." Washington v. Klem, 497 F.3d 272, 276 (3d Cir. 2007); see also Cutter v. Wilkinson, 544 U.S. 709, 721 (2005) (explaining that RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion"). To accomplish this protection, Section 3 of RLUIPA provides in pertinent part that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

See 42 U.S.C. § 2000cc–1(a). RLUIPA also has an "expansive[]" definition of "religious exercise," which includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." See Nunez v. Wolf, 117 F.4th 137, 146 (3d Cir. 2024) (quoting 42 U.S.C. § 2000cc-5(7)(A)).

In addition, "Congress mandated that [RLUIPA] 'shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by . . . the Constitution.'" See Holt v. Hobbs, 574 U.S. 352, 358 (2015) (quoting 42 U.S.C. §2000cc-3(c)). Overall,

> RLUIPA . . . affords inmates even "greater protection" than that provided by the First Amendment. Holt[, 574 U.S. at 357]. Under the latter, a prison regulation that substantially burdens religious exercise is subject to intermediate scrutiny and thus must be "reasonably related to legitimate penological interests," Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); under RLUIPA, however, that regulation is subject to strict scrutiny, requiring the government to prove that it "is the least restrictive means of furthering [a] compelling governmental interest," 42 U.S.C. §2000cc-1(a)(2). . . . [T]hat burden is a heavy

> one and carries unique implications in the prison context for both the interests recognized as compelling and the acceptable means to accomplish them.

See Nunez, 117 F.4th at 146 (first and second alterations added).

RLUIPA establishes a private right of action through which an aggrieved individual may "obtain appropriate relief against a government." See id. § 2000cc-2(a). It defines the "government" to include: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law . . . ." See id. § 2000cc-5(4)(A); Sharp v. Johnson, 669 F.3d 144, 153 (3d Cir. 2012) (identifying RLUIPA's definition of "government" (citing 42 U.S.C. § 2000cc-5(4)(A))).

"To state a plausible claim under RLUIPA, a [prisoner-]plaintiff must allege that the prison placed a 'substantial burden' on the plaintiff's sincerely held religious belief." Lapp v. Nye, No. 1:23-cv-419, 2024 WL 53017, at *7 (M.D. Pa. Jan. 4, 2024) (citing Washington, 497 F.3d at 277–78). A plaintiff can demonstrate that a substantial burden exists if:

> 1) a follower is forced to choose between following the precepts of [their] religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of [their] religion in order to receive a benefit; OR (2) the government puts substantial pressure on an adherent to substantially modify [their] behavior to violate [their] beliefs.

See Washington, 497 F.3d at 280 (capitalization of "OR" in original) (footnote omitted). "If a prisoner-plaintiff establishes a substantial burden on a sincerely held religious belief, the burden shifts to the defendant to show that the policy or practice furthers a compelling government interest and is the least restrictive means of doing so." Lapp, 2024 WL 53017, at *7 (citing Holt, 574 U.S. at 361–62); see also Holt, 574 U.S. at 355 (explaining that RLUIPA "prohibits a state or local government from taking any action that substantially burdens the religious exercise of an

institutionalized person unless the government demonstrates that the action constitutes the least restrictive means of furthering a compelling governmental interest").

## III. DISCUSSION

### A. Screening of Coit's Amended Complaint

#### 1. Requests for Injunctive Relief

Coit appears to seek forms of injunctive relief in his amended complaint insofar as he requests a "transfer" and the "implementation of policy" as part of his requests for relief. See (Doc. No. 11 at 65). Putting aside the fact that these requests for injunctive relief are impermissibly vague, the Court will dismiss them as moot.

Coit's allegations relate to events that allegedly occurred while he was confined at SCI Rockview, and he is no longer incarcerated at that state correctional facility. Instead, he is currently incarcerated at Pennsylvania State Correctional Institution Phoenix. See (Doc. No. 21). "A prisoner's transfer from the prison complained of generally moots [their] claims for prospective injunctive relief." Conway v. Rivello, No. 24-cv-00427, 2025 WL 308129, at *6 (M.D. Pa. Jan. 27, 2025) (citing Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003), as amended (May 29, 2003) and Abdul-Akbar v. Watson, 4 F.3d 195, 206 (3d Cir. 1993)). The only exception to this general rule is "when a challenged action is (1) too short in duration 'to be fully litigated prior to its cessation or expiration'; and (2) 'there [is] a reasonable likelihood that the same complaining party would be subjected to the same action again.'" See Sutton, 323 F.3d at 248 (quoting Abdul-Akbar, 4 F.3d at 206).

Here, Coit's vague requests for injunctive relief are limited to SCI Rockview and all Defendants were DOC employees at SCI Rockview during the events described in the amended complaint. Thus, Coit's requests for injunctive relief became moot upon his transfer from SCI

Rockview. Moreover, his requests do "not implicate the exception to mootness." See Washington v. Gilmore, No. 21-2876, 2022 WL 1073873, at *1, 2 (3d Cir. Apr. 11, 2022) (unpublished) (concluding that plaintiff prisoner's requests for injunctive relief, which included "a prohibition on the use of sick call refusal cards for inmates in the Secure Residential Treatment Unit where he was housed," was mooted by his transfer to a different correctional facility and his allegations did not meet the requirements for the mootness exception). Accordingly, the Court will dismiss as moot Coit's requests for injunctive relief whether asserted under Section 1983 or RLUIPA.

**2. Section 1983 Official-Capacity Claims for Monetary Damages**

Coit asserts Section 1983 claims for monetary damages against Defendants in their official capacities. See (Doc. No. 11 at 10). The Court will dismiss these claims because Defendants are not "persons" amenable to suit under Section 1983 when sued for monetary damages in their official capacities. Additionally, the Eleventh Amendment bars Coit's official-capacity claims.

Coit cannot maintain his Section 1983 official-capacity claims for monetary damages against Defendants because they are not "persons" amenable to suit under Section 1983. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under [Section] 1983."). In addition, Coit's Section 1983 official-capacity claims for monetary damages are barred by the Eleventh Amendment, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." See U.S. Const. amend. XI.

The Eleventh Amendment

> has been interpreted to render states—and, by extension, state agencies and departments and officials when the state is the real party in interest—generally immune from suit by private parties in federal court. Indeed, it has been recognized for over two hundred years that a state's immunity from suit in federal court is a fundamental principle of our constitutional structure that preserves, as intended by the Framers, the respect and dignity of the states and protects the ability of the states "to govern in accordance with the will of their citizens."

See Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 323 (3d Cir. 2002) (quoting Alden v. Maine, 527 U.S. 706, 751 (1999)).

Eleventh Amendment immunity extends to all state agencies, departments, and entities "having no existence apart from the state." See Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981) (citation omitted). As such, the DOC, as an agency of the Commonwealth of Pennsylvania, is entitled to the Commonwealth's Eleventh Amendment immunity. See 71 P.S. § 61(a) ("The executive and administrative work of this Commonwealth shall be performed by the . . . Department of Corrections . . . ."); Lavia v. Pa., Dep't of Corr., 224 F.3d 190, 195 (3d Cir. 2000) (stating that "[b]ecause the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity"); Downey v. Pa. Dep't of Corr., 968 F.3d 299, 310 (3d Cir. 2020) (explaining that "state sovereign immunity prohibit[ed]" plaintiff's Section 1983 claims against the DOC).

Defendants are state officials for purposes of Section 1983 because Coit alleges that they all work for the DOC. A suit for monetary damages brought against a state official in their official capacity "is not a suit against that official but rather is a suit against that official's office. As such, it is no different from a suit against the State itself." See Will, 491 U.S. at 71 (internal citation omitted); see also Kentucky v. Graham, 473 U.S. 159, 165–66 (1985) ("Official-capacity

suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S 658, 690 n.55 (1978))). Thus, Coit's Section 1983 official-capacity claims for monetary damages against Defendants constitute claims against the Commonwealth, which is immune from such claims under the Eleventh Amendment unless an exception to this immunity applies. See Will, 491 U.S. at 66, 70–71. A.W. v. Jersey City Pub. Schs., 341 F.3d 234, 238 (3d Cir. 2003) (explaining that Eleventh Amendment immunity "extends to state agencies as well as state officials sued in their official capacities for monetary damages").

There are three narrow exceptions to Eleventh Amendment immunity, only two of which are potentially applicable to Coit's Section 1983 official-capacity claims for monetary damages against Defendants.[18] Those two exceptions are if the state waives its immunity or Congress exercised its power under Section 5 of the Fourteenth Amendment to override that immunity. See Graham, 473 U.S. at 169 ("[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court."). However, neither of these exceptions apply here because the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. See 42 Pa. C.S. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); Lavia, 224 F.3d at 195 (explaining that Pennsylvania has not waived its Eleventh Amendment immunity). In addition, Congress did not intend to abrogate a state's Eleventh Amendment

[18] As for the third exception, the Eleventh Amendment does not bar a "suit[ ] against state officers for prospective relief to end an ongoing violation of federal law." See MCI Telecomm. Corp., 271 F.3d at 503. However, as explained supra, Coit's requests for injunctive relief (even if prospective in nature) are mooted by his transfer from SCI Rockview.

immunity by enacting Section 1983. See Quern v. Jordan, 440 U.S. 332, 345 (1979) (stating that "§ 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States"). Accordingly, the Court will dismiss with prejudice Coit's Section 1983 official-capacity claims for monetary damages against Defendants.[19]

### 3. Coit's RLUIPA Claims

Coit asserts RLUIPA claims against Defendants in their individual and official capacities. See (Doc. No. 11 at 10, 38–39). To the extent that Coit asserts RLUIPA claims against Defendants in their individual capacities, the Court will dismiss them with prejudice because "RLUIPA does not permit an action against [state officials] in their individual capacities." See Sharp v. Johnson, 669 F.3d 144, 154 (3d Cir. 2012); see also Mack v. Warden Loretto FCI, 839 F.3d 286, 303 (3d Cir. 2016) ("RLUIPA was enacted pursuant to Congress's powers under the Spending Clause, thereby allowing Congress to impose certain conditions, such as civil liability, on the recipients of federal funds, such as state prison institutions. Because state officials are not direct recipients of the federal funds, and thus would have no notice of the conditions imposed on them, they cannot be held individually liable under RLUIPA." (footnotes omitted)). Additionally, insofar as Coit asserts RLUIPA claims for monetary damages against Defendants in

---

[19] The Court recognizes that claims barred by the Eleventh Amendment ordinarily should be dismissed without prejudice even if the plaintiff may not reassert the claims in federal court, see Merritts v. Richards, 62 F.4th 764, 772 (3d Cir. 2023) ("Eleventh Amendment immunity is a threshold, nonmerits issue that does not entail any assumption by the court of substantive law-declaring power, and a dismissal on that basis, like dismissals for lack of jurisdiction, should normally be without prejudice." (internal quotation marks and citation omitted)). However, the Court will dismiss Coit's Section 1983 official-capacity claims for monetary damages against Defendants with prejudice because Defendants are not "persons" amenable to suit under Section 1983 when sued for monetary relief in their official capacities.

their official capacities, the Court will dismiss them without prejudice because "RLUIPA claims for damages against state officials in their official capacities are barred by the Eleventh Amendment." See Spada v. Klemm, No. 22-cv-00478, 2023 WL 2290258, at *6 (M.D. Pa. Feb. 28, 2023) (citing Sossamon v. Texas, 563 U.S. 277, 293 (2011)).

The only type of RLUIPA claim Coit could conceivably assert against Defendants would be an official-capacity claim for prospective declaratory or injunctive relief. See, e.g., Barros v. Wetzel, No. 14-cv-01746, 2015 WL 5785746, at *4 (M.D. Pa. Sept. 9, 2015) ("A RLUIPA cause of action is an official-capacity claim for declaratory and injunctive relief against the defendant, as the DOC official responsible for promulgating the statewide departmental policy on inmate observance of Ramadan."). However, because Coit's vague requests for prospective injunctive relief have been rendered moot by his transfer from SCI Rockview, Coit has no form of relief available to him under RLUIPA. As such, he may not proceed with a RLUIPA claim against Defendants in this case.

#### 4. Fourth Amendment Claims Based on Cell Searches

Coit alleges that C. Miller, Vogt, or Knapp ordered searches of his cell (some of which were conducted by CO Doe) on or about February 16, 2023, March 21, 2023, April 7, 2023, and May 24, 2023, all of which resulted in the confiscation of certain items of Coit's personal property such as, inter alia, his art supplies, certain legal papers, and family pictures. See (Doc. No. 11 ¶¶ 174–81, 183–84, 189–93, 197–99, 202). Coit also alleges that his repaired tablet was not returned to him once it arrived at SCI Rockview on or about March 28, 2023, see (id. ¶¶ 181–82), and that a new pair of Nike shoes was removed from his personal storage. See (id. ¶¶ 185–87, 200). He further alleges that he did not receive confiscation slips for his missing items in violation of DOC's policy, DC-ADM 203, see (id. ¶¶ 177, 180, 182, 184, 187, 193, 356–63),

which resulted in his inability to file grievances relating to the searches or lost personal property. See (id.). Coit claims that the searches and confiscation of his personal property violated his rights under the Fourth and Fourteenth Amendments. See (id. at 34–37, 63–64).

To the extent that Coit attempts to raise Fourth Amendment claims, he does not allege plausible claims because "prisoners have no legitimate expectation of privacy[,] and . . . the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells." See Hudson v. Palmer, 468 U.S. 517, 530 (1984); Doe v. Delie, 257 F.3d 309, 316 (3d Cir. 2001) ("The Supreme Court has concluded that the Fourth Amendment right to privacy, to be free from unreasonable searches, is fundamentally inconsistent with incarceration."). Accordingly, the Court will dismiss with prejudice Coit's Fourth Amendment claims against Knapp, C. Miller, Vogt, and CO Doe based on the aforementioned cell searches.[20]

**B. Coit's Request for Default and Motion for a Default Judgment**

Coit requests that the Clerk of Court enter default against Defendants and moves for a default judgment. The Court will direct the Clerk of Court to strike Coit's request for entry of default because Defendants are not in default insofar as they have not been served with his amended complaint to date. As for Coit's motion for a default judgment, the Court will deem it

---

[20] Having determined that Coit's Fourth Amendment claims are subject to dismissal, the Court must determine whether to grant him leave to amend this claim. Courts should generally give leave to amend but may dismiss a complaint with prejudice where leave to amend would be inequitable or futile. See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."); see also Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that [they have] leave to amend within a set period of time, unless amendment would be inequitable or futile."). Here, the Court finds that granting leave to Coit to amend his Fourth Amendment claim would be futile because he may not assert such a claim based on the cell searches.

withdrawn because he did not file a supporting brief in accordance with the Local Rules. See M.D. Pa. L.R. 7.5 ("Within fourteen (14) days after the filing of any motion, the party filing the motion shall file a brief in support of the motion. . . . If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn."). Even if the Court did not deem the motion withdrawn, the Court would deny it because, again, Defendants are not in default. Moreover, Coit cannot obtain a default judgment against Defendants without first having the Clerk of Court enter default against Defendants, see Fed. R. Civ. P. 55(a)–(b) (setting forth requirements for obtaining default judgment), and the Clerk has not entered default against Defendants.

### C. Coit's Motion to Appoint Counsel

Coit moves for the appointment of counsel in this matter. (Doc. No. 10.) The Court will deny this motion without prejudice.

As a civil litigant, Coit has no constitutional or statutory right to the appointment of counsel; nevertheless, district courts have broad discretionary power to request appointed counsel for such litigants who cannot afford counsel. See 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."); Montgomery v. Pinchak, 294 F.3d 492, 498 (3d Cir. 2002) (citations omitted). District courts follow a two-step process when deciding whether to request appointed counsel to represent an indigent civil litigant. See Houser v. Folino, 927 F.3d 693, 697 (3d Cir. 2019). First, as a threshold inquiry, the court must consider whether Coit's case has some arguable merit in fact and law. See Montgomery, 294 F.3d at 498–99 (citations omitted). Second, if the Court determines that Coit's case has some arguable merit in fact and law, then the court is to consider other factors, including: (1) his ability to present their own case; (2) the complexity of the legal issues; (3) the

degree to which factual investigation will be required and his ability to pursue such an investigation; (4) the extent to which the case is likely to turn on credibility determinations; (5) whether expert testimony will be required; and (6) whether he can retain and afford counsel. See Houser, 927 F.3d at 697 (citations omitted). This list, however, "is not meant to be exhaustive." See Tabron v. Grace, 6 F.3d 147, 157 (3d Cir. 1993); see also Houser, 927 F.3d at 700 (stating that "[w]e have always emphasized that [these] factors are only a guidepost for district courts in their exercise of the broad statutory discretion granted to them by Congress[,]" and that "[t]hey are not exhaustive, nor are they each always essential"). Rather, the court must determine on a case-by-case basis whether appointing counsel is warranted. See Tabron, 6 F.3d at 157–58.

As noted above, the threshold question relating to Coit's motion for appointment of counsel is whether his claims have "some arguable merit in fact and law." See Montgomery, 294 F.3d at 498–99. The Court has screened the amended complaint and determined that Coit has stated some plausible claims. Nevertheless, the remaining factors do not support appointing counsel to represent Coit at this time. Coit is an experienced pro se litigator who has, despite his incarcerated status, the ability to sufficiently assert his claims and arguments in this Court. In addition, the legal issues raised by Coit's claims do not appear to be overly complex, it does not appear that expert testimony is needed, and Coit appears to have the ability to conduct any necessary factual investigation into his claims. Additionally, although it appears that Coit is unable to afford private counsel and there could be credibility determinations pertaining to the events described in his amended complaint, the Court finds that the factors, on balance, do not

support appointing counsel for Coit at this time. Therefore, the Court will deny his motion to appoint counsel.[21]

## IV. CONCLUSION

For the reasons stated above, the Court will: (1) dismiss as moot Coit's requests for injunctive relief under Section 1983 and RLUIPA; (2) dismiss with prejudice Coit's Section 1983 claims for monetary damages against Defendants in their official capacities, his Fourth Amendment claims based on the cell searches, and his RLUIPA claims against Defendants in their individual capacities; (3) dismiss without prejudice Coit's RLUIPA claims for monetary damages against Defendants in their official capacities; (4) direct the Clerk of Court to strike Coit's request for entry of default; (5) deem withdrawn Coit's motion for a default judgment; (6) deny without prejudice Coit's motion to appoint counsel; and (7) direct the Clerk of Court to serve copies of the amended complaint and waiver of service forms on Defendants. At this stage, and without prejudice to any motions filed by Defendants, Coit may proceed on his Section 1983 claims for: (1) violations of the First Amendment based on retaliation and his inability to practice his religion; (2) violations of his rights under the Eighth Amendment to the United States Constitution based on (a) excessive force, (b) the conditions of his confinement, (c) a failure to protect, (d) deliberate indifference to his serious medical needs, and (e) his vulnerability to

---

[21] This denial will be without prejudice. See Tabron, 6 F.3d at 156–57 ("[A]ppointment of counsel under § 1915(d) may be made at any point in the litigation and may be made by the district court sua sponte . . . even if it does not appear until trial (or immediately before trial) that an indigent litigant is not capable of trying his or her case, the district court should consider appointment of counsel at that point."). If future proceedings demonstrate the need for counsel, the matter of whether counsel should be appointed may be reconsidered either sua sponte or upon Coit's motion.

suicide; and (3) violations of his due process and equal protection rights under the Fourteenth Amendment. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania